IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

NANCY MORRISON,

    Plaintiff,

v.

CHARTIS PROPERTY CASUALTY CO.,

    Defendant.

Case No.: 13-CV-116-JED-PJC

## PLAINTIFF'S MOTION TO COMPEL

COMES NOW the Plaintiff, Nancy Morrison, by and through her attorneys of record, and pursuant to Fed. R. Civ. P. 37(a)(2) and LCvR 37.1,[1] moves the Court for an order compelling Defendant Chartis Property Casualty Co. ("Chartis") to respond to Plaintiff's First Set of Interrogatories and Requests for Production as set forth herein.[2] In support, Plaintiff states the following:

## INTRODUCTION

On August 18, 2011, Plaintiff, Nancy Morrison, was seriously injured in a motor vehicle accident caused by the negligence of John Branum ("Branum" or "tortfeasor") when Branum was distracted by talking on his cell phone and failed to stop at a red light. The force of the impact spun Plaintiff's vehicle around 180 degrees and pushed her engine up into the center of her vehicle. *See* Chartis Investigation Report, attached hereto as Exhibit 2, p. CHARTIS-0027. Since the time of the crash, Ms. Morrison has undergone two (2) extremely invasive, medically necessary surgical procedures that

---

[1] Counsel held an in person meet and confer on September 19, 2013 regarding Defendant's discovery responses. The parties were unable to resolve all of their disputes and Plaintiff represents that the assistance of the Court is necessary with respect to the issues raised herein.

[2] A copy of Defendant's Responses to Plaintiff's Combined First Set of Interrogatories and Request for Production of Documents is attached hereto as Exhibit 1.

resulted directly from the injuries she sustained in the crash. These surgeries include a right shoulder arthroscopy with acromioplasty and rotator cuff repair and a breast prosthesis with secondary augmentation to repair damages to the implant Ms. Morrison received when she underwent a previous double mastectomy due to breast cancer. Ms. Morrison also suffered injury to her thyroid, causing her to lose an excessive amount of weight. The thyroid injury is also causing her to lose her hair. Additionally, Ms. Morrison suffered injuries to her cervical spine, resulting in disc herniations at her C4-C5 vertebrae. Ms. Morrison has attempted non-operative care to resolve the issues with her back pain, but to no avail. Her doctor has determined that surgical intervention would be the most appropriate treatment. The medical costs arising from the accident total over $50,000 and her future medical bills are estimated at $90,000.

A few days after the accident, Ms. Morrison, through her attorney, initiated a claim with Defendant Chartis under Plaintiff's underinsured motorist ("UIM") insurance policy, the policy limits of which are $500,000. Within days, Chartis concluded that Branum was 100% at fault for the accident and Plaintiff's injuries. Almost immediately, Chartis noted that Plaintiff's vehicle was a total loss.

Chartis took Plaintiff's statement on May 11, 2012, at which time Plaintiff discussed the extent of her injuries. Ex. 2. Ms. Morrison explained that in addition to the extensive surgeries and treatment she was forced to undergo, her injuries are so severe that she can no longer participate in activities she greatly enjoyed before the accident, such as playing golf and tennis, gardening, and holding her grandchildren. Ms. Morrison's injuries have caused severe disruption to her life, and have made impossible many of the daily activities that she cherished most.

On July 16, 2012, Plaintiff's counsel sent Chartis a copy of Plaintiff's medical records and billing related to the August 18, 2011 accident, as well as a medical authorization so Chartis could independently obtain any necessary medical documentation, and requested that Chartis tender benefits under Plaintiff's UM policy pursuant to *Burch v. Allstate Ins. Inc.*, 977 P.2d 1057, as the tortfeasor, Mr. Branum, was clearly underinsured for the damages sustained by Plaintiff. On August 31, 2012, Chartis, by and through its agent, Dan S. Folluo, requested *another* medical authorization, even though it had already been provided one less than two (2) months before, but advised that, at least initially, Chartis did not consider Plaintiff's claim to be an "underinsured" motorist claim. *See* Letter from Dan Folluo to Daniel Smolen dated August 31, 2012, Exhibit 3.

Thereafter, Plaintiff was forced to pursue the tortfeasor exclusively for satisfaction. On February 26, 2013, Plaintiff's counsel advised Chartis that Mr. Branum had tendered his liability policy limits of $500,000 and requested Chartis either waive subrogation against Mr. Branum's policy or substitute payment. On April 2, 2013, Chartis, by and through its agent Dan S. Folluo, agreed to waive subrogation. Thereafter, the tortfeasor's liability carrier was finally able to tender the $500,000 policy limits to Plaintiff.

To date, Chartis has wholly and completely refused to pay Plaintiff any benefits under her UIM policy, contending that Mr. Branum is not underinsured, ***despite the fact that his insurance policy tendered the limits of his liability policy***. Plaintiff has brought suit against Defendant for breach of contract and breach of Defendant's duty of good faith and fair dealing for its failure to pay benefits due and owing and its continued under-evaluation of Plaintiff's claim.

## DISCOVERY REQUESTS AT ISSUE

At issue are Plaintiff's Interrogatory Nos. 8 and 9 and Request for Production Nos. 2, 3, 8, 9 and 11. Plaintiff has categorized the discovery at issue into four (4) headings: (1) the claim file created and maintained by Defendant regarding Plaintiff's UIM claim (Request for Production No. 2); (2) Defendant's evaluation of Plaintiff's UIM claim, including specifically the loss reserves set by Defendant (Request for Production No. 8); (3) the personnel files of Defendant's employees who handled Plaintiff's UIM claim (Request for Production No. 11); and (4) the manner in which Chartis trains and directs its employees and agents to handle Oklahoma UIM claims (Interrogatory Nos. 8 and 9, Requests for Production Nos. 3 and 9). Each of these categories relate to Plaintiff's UIM claim, the handling of Plaintiff's UIM claim, and the policies and procedures in which Chartis directs its employees to handle UIM claims. The requested information is materially relevant to Plaintiff's claims for breach of contract and bad faith against Defendant and this Court should enter an order compelling Defendant to respond to Plaintiff's Interrogatory Nos. 8 and 9 and Request for Production Nos. 2, 3, 8, 9 and 11.

## ARGUMENT AND AUTHORITY

### I. DISCOVERY STANDARD

The information requested by Plaintiff is either directly relevant to material issues in this litigation or is "reasonably calculated to lead to the discovery of" evidence relevant thereto. *See* Fed. R. Civ. P. 26.

> Fed. R. Civ. P. 26(b)(1) establishes the scope of discovery in civil actions:
>
> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party…The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

4

Such discovery rules warrant liberal construction. *See Hickman v. Taylor*, 329 U.S. 495, 507 (1947) (directing "a broad and liberal treatment" of discovery rules). It is well established that discovery under the Federal Rules is limited only by relevance and burden. *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 343 (10th Cir. 1975); *see also AG Equip. Co. v. AIG Life Ins. Co.*, 2008 U.S. Dist. LEXIS 99915 (Okla. N.D. 2008) ("At the discovery phase of litigation, 'relavancy' is broadly construed and a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party."). Rule 401 of the Federal Rules of Evidence defines "relevant evidence" to mean "evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (emphasis added.)

## II. DISCOVERY AT ISSUE

### 1. Plaintiff's UIM Claim File.

Defendant refuses to produce any part of Plaintiff's claim file, including correspondence or claim diary entries, from July 24, 2012 forward.[3] It appears that on or about July 24, 2012, Chartis hired the law firm Rhodes, Hieronymus, Jones, Tucker & Gable, ("Law Firm") to assist in handling Plaintiff's UIM claim. Mr. Folluo, an attorney with Law Firm, actually communicated Chartis' initial under-evaluation of Ms. Morrison's claim to her counsel on August 31, 2012. Exhibit 3. Most, if not all, of the withheld documentation involves communication between Chartis and employees of Law Firm. Defendant maintains that entire claim file created from the date Chartis hired Law

---

[3] There are a number of parts of the Claim File that has been produced that have been marked as "redacted." Defendant's counsel has advised that these redacted portions predating July 24, 2012 relate solely to the loss reserves assigned to Plaintiff's claim by Defendant. Such information is addressed separately in subsection (2), *infra*.

5

Firm to assist in its evaluation, investigation and handling of Plaintiff's claims, onward, is protected from disclosure by the attorney-client privilege and/or as attorney work product.

The claims file maintained by an insurer is the heart and soul of a bad faith/breach of contract claim. It is the best evidence to determine what the insurer and its employees were doing and thinking during the time the claim was being evaluated. *See, e.g., Brown v. Superior Court in and for Maricopa County*, 670 P.2d 725 (Ariz. 1983) ("[B]ad faith actions against an insurer…can only be proved by showing exactly how the company processed the claim, how thoroughly it was considered and why the company took the action it did. The claims file is a unique, contemporaneously-prepared history of the company's handling of the claim; in an action such as this the need for the information in the file is not only substantial, but overwhelming."); *see also Silva v. Fire Ins. Exchange*, 112 F.R.D. 699, 699 (D. Mont. 1986) ("Under ordinary circumstances, a first-party bad faith claim can be proved only by showing the manner in which the claim was processed, and the claims file contains the sole source of much of the needed information. The time-worn claims of work product and attorney-client privilege cannot be invoked to the insurance company's benefit where the only issue in the case is whether the company breached its duty of good faith in processing the insured's claim…the general rule in cases of this nature should be that the plaintiff is absolutely entitled to discovery of the claims file.")

Here, Plaintiff's action is premised on Chartis' inadequate and unreasonable evaluation of her UIM claim. As such, what Chartis' agents and adjustors were thinking and doing during the time her claim was being handled is materially relevant and of the utmost importance. *See Timmons v. Royal Globe Ins Co.*, 1982 OK 97, 653 P.2d 901,

917 ("The essence of the cause before the Court is failure to deal fairly and in good faith with an insured and as such, the jury may be shown the entire course of conduct between the parties to arrive at a determination of whether that standard has been breached or not."); *see also Brown*, 670 P.2d at 735 ("[T]he reasons the insurance company denied the claim or the manner in which it dealt with it are central issues to Brown's claim of bad faith. Thus, the strategy, theories, mental impressions and opinions of Continental's agents…are directly at issue."). The mere fact that an attorney was involved in the matter is not sufficient to make a routine business investigation suddenly privileged. *See, e.g., Lindley v. Life Investors Insurance Company of America*, 267 F.R.D. 382, 394 (N.D. Okla. 2010), ("A key inquiry [in the attorney work product analysis] is whether the documents would have been created *regardless* of whether litigation was in the offering. In other words, the anticipation of future litigation must have been the primary motivation which led to the creation of the documents.") (emphasis in original) (citations omitted); *see also Ledgin v. Blue Cross & Blue Shield,* 166 F.R.D. 496, 498 (D.Kan. 1996) ("Materials assembled in the ordinary course of business or for other non-litigation purposes are not protected by the work product doctrine. The inchoate possibility, or even likely chance of litigation, does not give rise to work product.") (citations omitted).

Law Firm handled Plaintiff's claim for insurance benefits against Defendant personally and directly and Chartis relied on Law Firm's representations, opinions and conclusions when determining whether or not to pay Plaintiff's claim. Communications between Law Firm and Defendant were not made for the purpose of facilitating the rendition of legal services; rather, they were made for the purpose of facilitating the investigation and evaluation of Plaintiff's claim under the applicable policy of insurance, a routine *business* purpose. It is axiomatic that investigating and evaluating an insurance

claim is a matter of routine business for an insurance company. *See Lindley*, 267 F.R.D. at 399; *see also Harper v. Auto-Owners Ins. Co.*, 138 F.R.D. 655, 663-664 ("It is presumed that a document or thing prepared before a final decision was reached on an insured's claim, and which constitutes part of the factual inquiry into or evaluation of that claim, was prepared in the ordinary and routine course of the insurer's business of claim determination and is not work product.") (emphasis added); *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 700-701 (S.D. Fla. 2007) (finding that documents prepared before the final decision on an insured's claim were not protected under the attorney work product doctrine, nor were they privileged). If an insurance company were permitted to claim privilege as urged by Defendant, it would be able to farm out the investigation and evaluation of its claims to persons with *juris doctorate* degrees and never have to produce *any* documentation in a bad faith case such as this. Such a result is in direct conflict with both federal and Oklahoma law as described herein. *See Lindley*, 267 F.R.D. at 392, n.11 ("'[W]here businesses use their attorneys for non-legal purposes to promote the interests of the corporation, their communications are not protected by the privilege…Common sense tells us that there is a difference between merely providing legal information and providing legal advice.'") citing John K. Willa, *The Attorney-Client Privilege and In-House Corporate Counsel*, 1 Corporate Counsel Guidelines 1:16 (2009) (footnotes omitted).

Recently, Judge Clearly addressed this issue in the case of *Butterfly-Biles v. State Farm Life Ins. Co.*, 2010 U.S. Dist. LEXIS 4701 (N.D. Okla. 2010). In that case, the plaintiff sought to compel testimony from State Farm's representative regarding State Farm's investigative conduct, including conduct that took place *after* the lawsuit was filed. *Butterfly-Biles*, 2010 U.S. Dist. LEXIS 4701 at *7-9. The Court determined that because the

focus of the claim was State Farm's conduct up to and including the time it made a decision to deny Plaintiff proceeds under the policy, that conduct was relevant and discoverable even after a lawsuit was filed and an attorney was involved:

> The investigation of Plaintiff's claim was within the normal course of State Farm business. Since no decision as to payment or denial had been made even after the lawsuit was filed, this investigatory conduct may be relevant to Plaintiff's bad faith claim. The fact that State Farm had an attorney involved in the matter after the lawsuit was filed is not sufficient to make a routine business investigation suddenly privileged.
>
> \* \* \*
>
> State Farm offered three explanations for directing Boden not to testify on this subject: (1) Post-litigation privilege, (2) work product, and (3) 'consulting the experts.' The Court is unaware of a blanket post-litigation privilege. As discussed above, since no decision as to payment or denial of Plaintiff's claim was made at the time the lawsuit was filed, and State Farm stated it was still investigating, post-litigation activities are relevant and unprivileged. Second, the routine insurance investigation begun after Plaintiff made her claim under the life insurance policy did not suddenly become attorney work product simply because a lawsuit was filed. Finally, State Farm's assertion that testimony on this subject was precluded because 'It's consulting the experts' is unsupported by any authority.

*Id*. at \* 8-10 (citations omitted).

If the fact that an insurance company involves an attorney *after* suit is filed is not sufficient to make a routine business investigation privileged, there is no way that Law Firm's *pre-litigation* involvement is sufficient to make privileged those parts of the investigative claim file created before suit was ever filed. *See also Scott v. Peterson*, 126 P.3d 1232, 1234 (Okla. 2005). Additionally, the fact that an attorney's involvement relates to legal interpretations and opinions is not sufficient to shroud investigative conduct in

privilege if those interpretations and opinions have a bearing on the insurer's handling of the claim:

> In the case at bench it is possible, for example, that the insurer denied payment of the claim because of a legal theory (that there was no coverage), a mental impression (that the insured had exaggerated the claim), an opinion (that the file was attributable to arson), etc. If the file shows such a reason for the denial of the claim, this information would go to the very heart of the question of whether the company acted in good or bad faith and must be admissible, and thus discoverable, in a subsequent bad faith case. Similar considerations would exist in a variety of other actions such as legal malpractice, malicious prosecution, abuse of process and all other cases in which the issue is the motive or reasons for, or the propriety or impropriety of a party's actions in handling a prior legal matter or proceeding. Thus, the absolute immunity accorded for the essence of work product – mental impressions, conclusions, opinions or legal theories of the attorney or other representative – would apply ***only to the case being litigated (here, the bad faith case) and not to such material prepared for some prior case which is the subject of the instant litigation***.

*See Brown*, 670 P.2d at 735-36, nt. 8 (emphasis added).

It is Plaintiff's belief that the redacted and withheld portions of the claim file reveal the legal theories, mental impressions and opinions of Chartis and its agents that Chartis relied on when handling Plaintiff's claim and that Chartis used to support its decision not to tender benefits. Here, as in the *Brown* case, this information goes to the very heart of the question of whether or not Chartis acted reasonably and in good faith. Plaintiff is not seeking the mental impressions, conclusions, opinions or legal theories of Defendant's present counsel that relates to *this* case, that is, the bad faith case[4]; rather,

---

[4] Undoubtedly in an attempt to lend legitimacy to its position not to produce that part of Plaintiff's UIM claim file created after Law Firm became involved, Chartis decided to hire Law Firm to represent it in the instant matter. However, as set forth in the authority cited herein, the fact that an attorney is retained to defend an insurer does not convert routine insurance business investigation and evaluation into privileged communication or attorney work product.

10

she is seeking only the information set forth in the claims files that relate to Chartis' investigation and evaluation of her claim.

The relevant time period for a claim of bad faith is that time during which an insurance company was handling, investigating and evaluating a claim. *See Butterfly-Biles*, 2010 U.S. Dist. LEXIS 4701, * 8. It is well established in Oklahoma jurisprudence that an insurer's duty to act in good faith and fair dealing continues until the benefits due under the policy in question are denied or paid *in toto*. *Hale v. A.G. Ins. Co.*, 2006 OK CIV APP 80, ¶ 6 ("[T]he analysis in bad faith cases indicates the cutoff for relevant evidence is the date of payment or denial of the claim. The duty of good faith and fair dealing exists during the time the claim is being reviewed") *citing Newport v. USAA*, 2000 OK 59, 11 P.3d 190 and *Skinner v. John Deere Ins. Co.*, 2000 OK 18, 998 P.2d 1219. As Judge Clearly recently opined, the mere fact that litigation is pending does not provide a blanket protection over all documents. *See Butterfly-Biles*, 2010 U.S. Dist. LEXIS 4701 at * 9 ("The investigation of Plaintiff's claim was within the normal course of State Farm's business. Since no decision as to payment or denial had been made even after the lawsuit was filed, this investigatory conduct may be relevant to Plaintiff's bad faith claim. The fact that State Farm had an attorney involved in the matter after the lawsuit was filed is not sufficient to make a routine business investigation suddenly privileged."). Chartis has never expressly denied Plaintiff's claim. In fact, it admittedly continued to investigate Plaintiff's claim, by and through Dan Folluo, even after it advised Plaintiff of its initial position that her claim was not "an 'underinsured' motorist claim" as of August 31, 2012. Ex. 3. Chartis expressly represented that its evaluation of Plaintiff's claim is "continuing." *Id*. Because Chartis's investigation and evaluation of the claim is ongoing, post-litigation investigatory conduct contained in the claims file is

as relevant and material to this case as pre-litigation conduct. Accordingly, Plaintiff asks that all documents contained in the claims files created after July 24, 2012 to present that relate to Chartis' continuing investigation and evaluation of Plaintiff's claim be produced to Plaintiff.

**2. Defendant's evaluation of Plaintiff's UIM claim.**

Plaintiff is seeking documents that relate to the reserves set by Defendant for her UIM claim; that is, Plaintiff seeks documents reflecting the range of value Defendant established for her claim. Defendant refuses to produce any loss reserve information.

The range at which Defendant evaluated Plaintiff's claim is materially relevant in bad faith actions. *See Newport v. USAA*, 11 P.3d 190, 196-97 (Okla. 2000) (finding that an insurer's offer of less than the low end of its range of value assigned to the claim was evidence of bad faith). Loss reserves represent that amount anticipated to be sufficient to pay obligations for which the insurer may be responsible under the policy with respect to that particular claim. *Lipton v. Superior Court*, 56 Cal. Rptr.2d 341, 348-49 (Cal. Ct. App. 1996). In concluding that loss reserves were discoverable in a bad faith case, the California Court of Appeals provided in an opinion that has been cited favorably by this Court: "The evaluation of a case made by an insurer, whether compelled by law or business prudence, is information which might well lead to discovery of evidence admissible on any number of issues which commonly are presented in bad faith actions." *Id.*; *see also Oneok Inc. v. National Union Fire Ins. Co.,* Not Reported in F.Supp.2d, 2007 WL 2891519 (N.D. Okla., September 28, 2007) (citing favorably *Lipton*, 56 Cal. Rptr. 341) (recognizing a split of opinion concerning the discoverability of loss reserves to ultimately conclude that such reserves are and should discoverable in a bad faith action); *Tackett v. State Farm Fire & Cas.*, 558 A.2d 1098, 1105 (Del. Super. Ct. 1988)

("[R]eserve figures which are the product of mental impressions, opinions and conclusions of the insurer's agents are likewise discoverable [in a first party bad faith claim]."); *Groben v. Travelers Indem. Co.*, 266 N.Y.S.2d 616, 619 (Sup. Ct. 1965) aff'd, 28 A.D.2d 650, 282 N.Y.S.2d 214 (1967) ("[E]xamination with respect to the reserve may develop evidence on the issue of defendant's bad faith. Bad faith is a state of mind which must be established by circumstantial evidence. The actions of defendant in respect to the reserve are relevant. Negligent investigation and uninformed evaluation of the worth of the Rosen claims go to the heart of the case since serious and recurring negligence can be indicative of bad faith. Defendant's actions on the reserve may have a direct bearing on the issue."); *Mirarchi v. Seneca Specialty Ins. Co.*, Not Reported in F.Supp.2d, (holding that loss reserves were discoverable because they were potentially relevant to the plaintiff's bad faith claim, "to the extent that employees or agents of [defendant insurer] discussed the value of [the plaintiff's] claim or other factual information regarding the claim in connection with setting the reserves."). The Court should compel Defendant to produce information related to the loss reserves set for Plaintiff's UIM claim.

3. **Personnel Files.**

Plaintiff asked Defendant for the personnel files of each claim-handler, adjustor, team leader, supervisor, manager, etc., who was responsible for determining or supervising decisions regarding payment of benefits on Plaintiff's claim. Information from such employees' personnel files pertaining to background, qualifications, training and job performance is relevant and discoverable in an insurance breach of contract and bad faith action. *See Waters v. Continental General Ins. Co.*, Not Reported in F.Supp.2d, 2008 WL 2510039, *1 (N.D. Okla. 2008); *see also Fullbright v. State Farm*, Not

13

Reported in F.Supp.2d, 2010 WL 300436, * 3-4; Opinion and Order in *Davidson v. SAFECO Ins. Co.*, 10-CV-827-TCK-FHM, p. 5 (N.D. Okla. Oct. 7, 2011) (attached as Exhibit 4) ("The Court finds that information in the personnel files of Defendant's employees who actually handled Plaintiff's claim are relevant to the extent that they show the employees' background, qualifications, training and job performance."). Chartis should be compelled to produce the personnel files for the individuals it has identified as having been involved in handling Plaintiff's UIM claim (*i.e.*, Brittan Reed, Jeff Carroll, and Brian Applebee, *see* Ex. 1 at 1-2). Plaintiff has already agreed to stipulate to a protective order to protect the privacy interests of such employees and that Defendant need not produce any documents related to the employees' medical conditions that may be contained in their respective personnel files. The Court should compel Defendant to produce the balance of the requested information.

**4. Policy and Procedure regarding the handling of Oklahoma UIM claims.**

Plaintiff seeks information regarding Chartis' training procedures with respect to Oklahoma UIM claims, certification/training requirements and copies of Chartis' claims manuals. Defendant agreed to produce "some 'best practices' material" and/or a copy of the "Private Client Group, Casualty Claims Handling Guidelines" pursuant to an Agreed Protective Order.[5] If this material is the only information responsive to Plaintiff's discovery requests, Defendant needs to affirmatively state so in a formal discovery response. If not, Defendant needs to produce all responsive information. Plaintiff has agreed to enter into a protective order regarding any proprietary information Defendant desires to be kept confidential. Further, the requested information is clearly relevant as

---
[5] It is unclear whether the "best practices" material Defendant refers to in its letter memorializing the parties' LCvR37.1 conference is the same as the Private Client Group, Casualty Claims Handling Guidelines identified in its discovery responses.

Plaintiff has brought claims based on the improper manner in which her claim was handled by not one, but several UIM adjustors and other agents of Defendant. *See Fullbright v. State Farm Mut. Auto. Ins. Co.*, Not Reported in F.Supp.2d, WL 300436, *4 (W.D. Okla. 2010) (recognizing that the educational and training background of adjustors who participated in handling a claim is relevant in an action for bad faith). Defendant should be compelled to identify its training procedures with respect to the handling of Oklahoma UIM claims and to produce the materials used to train its employees in the handling of such claims. *See e.g. Vinning on Behalf of Vinning v. Enterprise Financial Group*, 148 F.Supp.3d 1206, 1218 (10th Cir. 1998) (evidence of insurer's general business practices that show insurer engaged in a consistent pattern of abusive rescissions are "clearly relevant" in bad faith cases); *Bullard v. American Travellers Life Ins. Co.*, Not Reported in F.Supp.2d, 1998 WL 35274692, *2 (W.D. Okla. 1998) relying on *Vinning*, 148 F.Supp. 1206, (training manuals and other evidence of policies and procedures are relevant to issue of pervasive and consistent pattern of abuse and admissible to prove a broad and deliberate pattern of unfairly denying claims); *Broadway Park, LLC v. Hartford Cas. Ins. Co.*, Not Reported in F.Supp.2d,, 2006 WL 2321410, *2-3 (W.D. Okla. 2006) (ordering defendant to produce to plaintiff its claims management policies, procedures, guidelines and recommendations for the adjustment of property damage claims, including property claims manual and internal instructional or training materials).

## CONCLUSION

Plaintiff served carefully drafted discovery requests that were narrowly tailored to procure information relevant to Defendant's training policies and procedures and the manner in which Plaintiff's UIM claim was handled by Defendant, its agents and employees. The information sought is materially relevant to Plaintiff's breach of contract

and bad faith claim against Defendant Chartis. The Court should compel Defendant to respond to Plaintiff's discovery requests.

WHEREFORE, premises considered, Plaintiff prays this Court enter an order compelling Defendant Chartis to respond to Plaintiff's discovery requests as set forth herein, as well as all such other relief as the Court deems just and equitable.

Respectfully Submitted,

**SMOLEN, SMOLEN & ROYTMAN, PLLC**

/s/Laura M. Lauth
Donald E. Smolen, II, OBA #19944
Laura M. Lauth, OBA #22619
701 S. Cincinnati Ave.
Tulsa, OK 74119
(918) 585-2667 P
(918) 585-2669 F
donaldsmolen@ssrok.com
lauralauth@ssrok.com
*Attorneys for Plaintiff*

**CERTIFICATE OF FILING**

      I hereby certify that on this 8th day of November, 2013, I caused the above and foregoing to be submitted to the Clerk of Court using the ECF system for filing and for transmittal of a Notice of Electronic Filing to all counsel of record in this case.

                                                    /s/Laura M. Lauth